OPINION
Defendant-appellant Jacqueline Stone appeals from the August 3, 2001, Judgment Entry of the Holmes County Court of Common Pleas granting judgment in the amount of $14,295.24 in favor of plaintiff-appellee David Stone and against defendant-appellant on David Stone's unjust enrichment claim.
 STATEMENT OF THE FACTS AND CASE
The marriage of appellee David Stone and appellant Jacqueline Stone was dissolved by the Holmes County Court of Common Pleas on March 1, 1989, in Case No. 89-D-18.
On September 5, 2001, appellee filed a complaint against appellant in the Holmes County Court of Common Pleas. Appellee, in count one of his complaint, asked the trial court to issue a judgment "holding the proceeding held in this Court Under Case Number 89-D-18 void ab initio" since the parties had filed a sham petition for dissolution of their marriage. In count two of his complaint, appellee sought a declaration from the trial court that the parties "are and have been married by Common Law since March 1, 1989." Finally, in the last count in his complaint, appellee raised an unjust enrichment claim, seeking one half of the equity in the house in which the parties resided. As memorialized in a Journal Entry filed on November 8, 2000, the trial court granted appellant's motion to dismiss count one of the complaint. Thereafter, with leave of court, appellee filed an answer to appellant's complaint.
Subsequently, a bench trial was held in this matter on July 17, 2001. The following evidence was adduced at trial.[1]
As is stated above, the parties' marriage was dissolved in 1989. However, despite the dissolution of their marriage, the parties continued living together on an "off and on basis" until October of 2000.
In 1991, appellant purchased property located on County Road 25 in Richland Township, Holmes County, Ohio. According to appellee, appellant made the $500.00 down payment on the property and "we were going to make payments on the rest of it". Trial Transcript at 195. While the deed to the property was only in appellant's name, both appellee's and appellant's names appeared on the adjustable rate notes for the construction loans. The two notes, which together totaled $42,690.32, were secured by mortgages on the property. The open-end mortgages contained both parties' names. At the time of the trial, the outstanding balance on the mortgage was $26,409.53.
Both parties agree that the home that was constructed on the subject real estate can be described as a "Do-it-Yourself" effort. At trial, appellee testified that prior to building a house on the property, he cut down over 140 pine trees and a number of rose bushes. After appellee cut down the same, appellant would "drag the branches out and throw them in a pile for us to get ready to burn". Trial Transcript at 199. According to appellee, after the initial grading was done on the property, appellee did most of the leveling of the land and put in the driveway. When asked, appellee testified that he rented and paid for a bulldozer to put in the driveway.
At trial, appellee testified that he did most of the construction on the house himself with help from family and friends. Appellee testified that he installed dry wall and paid for the same, put up barn siding in the living room, and built a porch onto the side of the house using treated lumber that originally had been used to build the front porch. Appellee testified that he tore the front porch off after appellant decided that she wanted the front porch to have a concrete floor rather than treated lumber flooring. The following is an excerpt from appellee's testimony at trial:
 Well, the wood that's on the side porch used to be on the front porch. The front porch originally was treated lumber. And then she decided she didn't want treated lumber there, so I tore all the treated lumber flooring off the front porch and she wanted concrete. So my sister's ex-husband, Rodney Wallheeter came, and we pulled concrete on for a front porch.
Trial Transcript at 228. When asked how the footers and slab were poured, appellee responded as follows:
 A. Ed Britt dug the footers out and then we hired an Amishman from over around Brinkhaven. He came and he poured the footers, and he's the one that laid up all the block. My brother and my dad and relatives, we all tended for him. We kept him supplied with mud and mortar. And we moved his scaffolding. All the Amishman did was laid the block.
Trial Transcript at 228.
With respect to the construction of the house, during trial, appellee further testified that he installed the roof trusses twice with help from his father and other relatives[2]. After the trusses were in place, appellee installed the shingle roof with help from his father, brothers and friend, installed all wiring from the "electric meter in", and installed the furnace, all of the plumbing and the fiberglass insulation. Trial Transcript at 231. Appellee testified at length regarding extensive labor he expended in making changes to the property due to appellant's demands. For example, after appellee completed all of the work on the bathroom except for installing the bathroom sink, appellant "decided she wanted to make the bathroom bigger". Trial Transcript at 232. As a result, appellee had to knock out and move walls and relocate plumbing. When questioned, appellee testified that he had to rebuild the bathroom three times at appellant's request and was forced to reinstall the inside stairs two times after appellant "decided they were too steep and she didn't like the landing". Trial Transcript at 234. According to appellee, walls in the house were constantly moved and the location of various rooms changed due to appellant's indecisiveness. The following is an excerpt from appellee's testimony at trial:
Q. Okay. And the third time what happened?
A. On the steps?
Q. Yeah.
 A. It was the third time when I had to move them ninety degrees. Two times they were both in the same area. She just didn't like the landing and the steepness of them the first and second time. And the third time is when she wanted them moved to ninety degrees so instead of coming right by the door they would come up at a ninety degrees from the door.
 Q. Is the living room built the same way it was in the original plans?
A. No, it isn't.
Q. Tell us about the living room.
 A. The original plans, the back side of the house would have been the kitchen, the bathroom and the dining room and the utility room. Well now where the kitchen should be and the dining room should be is the living room at the present time.
 Q. Well did you build it the way it was in the plans the first time?
 A. No. The kitchen was never built the first time because we never had the cupboards and stuff. We worked on the living room. The kitchen, we had like a designated area, and I think I might have had a sink there. And that was it. The stove and the refrigerator was there.
Q. Did you have walls up?
 A. There was a wall between like where the living room and the kitchen would be.
Q. And did you move the wall?
A. Yes. I moved that wall at least four times, I think.
Q. Was it ever a completed wall?
 A. Yes. And then she changed her mind and she decided she didn't want that wall there, so I took it back down.
Q. Who paid for that?
 A. I did. I took it down. It didn't cost nothing to take it down. It was just my labor.
Q. How about putting it back up, the material?
 A. Some of it was worth the boards, the same boards I just used them over again.
 Q. And the present, one of those I pictures showed the living room now, is that correct?
A. Yes.
 Q. And there was two pictures there, the living room with the rough siding. And was it finished with the rough siding?
 A. It wasn't completely finished. All the paneling was up, the barn siding paneling. It was all up.
Q. And who took it down?
A. I took it down.
Q. What did you put up in place?
A. Drywall.
Q. And what about was waist high?
A. That was cedar siding.
Q. Who paid for that?
A. She did.
 Q. Okay. And how much bigger was the living room made then?
 A. Probably at least a good twelve foot more bigger. Twelve by twelve. Because it got rid of the kitchen and what would have been the dining room at that time. It was all made into one room.
 Q. Okay. Was there a wall separating the dining room from the living room originally?
 A. No. There would have been like a doorway you would walk through and be right into the dining room.
Q. Was that built?
A. Yeah, it was at one time.
Q. And was it taken down?
A. Yes. I tore it down.
 Q. Okay. How about the ceilings? Who put the ceilings up?
A. I did.
Q. Where did the material come from?
 A. Probably the construction loan. I can't be sure because eventually this money for the construction loan over the course of time had to have run out.
Q. Well the last payment you said was made when?
A. The construction loan?
Q. Yeah.
A. Was disbursed in `93.
Q. And what was the total disbursement in `93?
 A. I thought it was around $5,000, cause most of it had been spent before because of the major costs of trusses and blocks and so.
 Q. How much revision was done after that disbursement of the final $5,000?
A. There was revisions done to that house constantly.
 Q. All right. Let's see. Let's talk about the bedroom. What happened to the bedroom?
 A. Originally the bedroom downstairs was on the southwest side of the house. It was totally completed. It had a closet in it and the ceiling. Everything was there except floor, a carpeting or something for the floor. But it was totally done, the bedroom downstairs was. And then she decided she didn't like it, the paneling, so she had me take all the paneling off because the paneling had warped because of the moisture in the house. And that paneling is the paneling she picked out.
Q. Okay.
 A. Then the bedroom got tore down because she thought that would make a nice living room in that area, so I tore out all the walls. I took everything out of that room. The ceiling I took back down and I moved everything upstairs for a bedroom and she decided that would make a nice living room. So I commenced to drywalling what used to be the bedroom. So I took all the paneling off and I started to drywall it. And when I got it done she said, "Well, this would make a nice kitchen." And from going to be a living room now it's presently the kitchen.
Q. Had to tear it down again?
 A. No. It just, it was all pretty much drywalled and everything. I just kept working on it and made it into the kitchen.
Q. Had to bring all the plumbing over there again?
 A. Yeah. The pluming had to be all changed to move from the north side of the house to the center of the house.
Trial Transcript at 235-238. Appellee also testified that he had almost all of an outside retaining wall completed before appellant "didn't like it" and had him take the same down and build one out of railroad ties. Trial Transcript at 246.
During cross-examination, appellee admitted that appellant never told him that he would be reimbursed for his work on the house and never promised him anything in return for doing the work.
Appellant Jacqueline Stone testified at trial on her own behalf. Appellant testified that she made all of the $300.23 monthly payments on the construction loan, the tax payments and the insurance payments on the property herself with no assistance from appellee and that, from the time that the parties moved into the house in 1993 until October of 2000, appellee did not pay her any rent. According to appellant, appellee only paid the electric and phone bills and occasionally paid for the heating oil and/or wood pellets for the stove. Appellant further testified that she purchased large items for the house from her own money. During direct examination, appellant testified that she saved $5,200.00 for kitchen cabinets by working lots of overtime over the period of a year and a half.
Appellant also contested appellee's claim that he did the bulk of construction work on the house. Appellant testified that she "was on the roof cutting shingles, putting vents". Trial Transcript at 298. Testimony was also adduced at trial that appellant assisted the Amish man who was laying block for the foundation by helping with carrying the block. When questioned about how she assisted in the construction of the interior of the house, appellant testified that she put up paneling, put mud on drywall, wallpapered, painted, cut boards, varnished, put up ceiling tile and helped appellee install the kitchen floor by "fitting boards together and gluing them." Trial Transcript at 301. During direct examination, appellant testified that, with respect to the ceiling, she cut and handed appellee boards while he was on a ladder. Appellant testified that she never told appellee that she was going to reimburse him. Appellant also testified that she never promised appellee anything in return for his labor. Appellant further testified that she helped to move studs in the walls. According to appellant, she did "just as much" as appellee on the construction of the interior of the house. Trial Transcript at 302. The following is an excerpt from appellant's testimony at trial:
 Q. How about on the exterior of the home? Was there a time that siding was put on the home?
A. Yes.
Q. And did you assist with respect to that?
 A. Yes, I did. And I also helped cut the insulation that went on before the siding went on.
Q. Okay. What was your role with respect to the siding?
 A. I helped hold it while he cut the long pieces on the saw, held it up while he nailed it.
 Q. Okay. And what about the landscaping in the area of landscaping?
 A. Mostly I did. He did help like move dirt some and I did the planting.
Trial Transcript at 302.
As memorialized in a Journal Entry filed on August 3, 2001, the trial court granted judgment in favor of appellee and against appellant in the amount of $14,295.24 on appellee's unjust enrichment claim. The trial court, in so holding, stated, in part, as follows:
 . . . the plaintiff provided almost all of the labor for the construction of the defendant's residence and the plaintiff is jointly indebted with the defendant upon a mortgage and note for the defendant's residence. For the Court to allow the defendant to conclude her relationship with the plaintiff without compensating the plaintiff for his labor and for his obligation on the mortgage is inequitable and would result in unjust enrichment at the plaintiff's expense.
 The Court must then move to the issue of plaintiff's damages for defendant's unjust enrichment. The Court finds that the fair-market value of the residence pursuant to the testimony of defendant's appraiser is $55,000. The Court rejects the appraisal submitted by the plaintiff. The balance due and owing on the mortgage is $26,409.53. The defendant thus has equity in the residence of $28,590.47. The Court finds that it is equitable to award judgment in favor of plaintiff and against defendant for one-half of the equity in defendant's residence, namely $14,295.24.
It is from the trial court's August 3, 2001, Journal Entry that appellant now appeals, raising the following assignments of error:
 A JUDGMENT FOR DAMAGES PREDICATED UPON THE THEORY OF UNJUST ENRICHMENT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN RETENTION OF THE BENEFITS BY DEFENDANT-APPELLANT, JACQUELINE R. STONE, WAS NOT UNJUST OR UNCONSCIONABLE.
 A JUDGMENT FOR DAMAGES PREDICATED UPON UNJUST ENRICHMENT IS CONTRARY TO LAW WHERE THE RECORD CONTAINS NO EVIDENCE OF THE VALUE OF SERVICES FOR WHICH COMPENSATION IS SOUGHT.
 I, II
Appellant, in her two assignments of error, challenges the trial court's judgment in favor of appellee predicated upon a theory of unjust enrichment. Appellant specifically contends that such judgment is both against the manifest weight of the evidence since the retention of benefits by appellant was not unjust or unconscionable, and contrary to law since the record contains no evidence of the value of services for which appellee sought compensation.
As appellant notes in her brief, "[t]here is no precedent in Ohio for dividing assets or property based on mere cohabitation without marriage . . ." Seward v. Mentrup (1993), 87 Ohio App.3d 601, 603, citing Lauperv. Harold (1985), 23 Ohio App.3d 168, 170. While recognizing that a property division, per se, only applies to marriages, the court, inSeward, stated as follows: "even as we are unwilling to recognize a separate status for unmarried persons who are living together, we acknowledge that in any type of relationship . . . there exists the possibility that one party may become unjustly enriched at the expense of another". Id., citing Lauper, supra., at 170. Thus, the first issue for determination is whether appellant was unjustly enriched at the expense of appellee.
In order to recover under a theory of unjust enrichment or quasi-contract, a plaintiff must prove by a preponderance of the evidence: (1) the plaintiff conferred a benefit upon the defendant, (2) the defendant had knowledge of such benefit, and (3) the defendant was retaining that benefit under circumstances where it would be unjust for him to retain that benefit without payment. Hambleton v. R. G. BarryCorp. (1984), 12 Ohio St.3d 179, 183. See, also, Hummel v. Hummel
(1938), 133 Ohio St. 520, 525.
In the case sub judice, appellant specifically argues that the trial court's judgment is against the manifest weight of the evidence since the retention of benefits by appellant was not unjust or unconscionable. In applying the manifest weight standard of review, our role is to determine whether there is relevant, competent and credible evidence upon which a fact finder could base its judgment. Cross Truck v. Jeffries (Feb. 10, 1982), Stark App. No. CA-5758, unreported. Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Constr. (1978), 54 Ohio St.2d 279,281.
Upon our review of the record, we find that the judgment of the trial court was not against the manifest weight of the evidence since there was competent and credible evidence supporting the trial court's determination that appellant was unjustly enriched at the expense of appellee. We concur with the trial court that "to allow defendant [appellant] to conclude her relationship with the plaintiff [appellee] without compensating the plaintiff for his labor and for his obligation on the mortgage is inequitable and would result in unjust enrichment at the plaintiff's expense". There was competent and credible evidence adduced at trial that appellant provided almost all of the labor in the construction of the house. In addition to appellee's testimony, which is set forth in detail in the statement of facts above, Rusty Stone, appellee's brother, testified at trial that appellee had "done the siding, the roofing, basically most everything" and that appellee "was drywalling; he was putting cabinets in; he was plumbing; he done most of the electrical work". Trial Transcript at 19, 20. Rusty Stone corroborated his brother's testimony that, based on appellant's indecisiveness, appellee was frequently forced to redo work that had already been done. According to Stone, appellant "would want one room done this way, two months later she would want it tore out and redone another way. He done that year after year." Trial Transcript at 19.
In addition, James Dial, a friend of appellee's, testified at trial that he had assisted appellee in installing the stairs, in putting up kitchen cupboards, and in installing the kitchen ceiling. Dial, when questioned, admitted that when he was at the house to help appellee with construction, he never saw appellant "do any work around the house in the construction of the house". Trial Transcript at 39. At trial, Raymond Ward Porter, another friend of appellee's, testified that he assisted appellee with construction of the bedroom, the stairs, the kitchen and the bathroom and admitted that he never saw appellant "doing any of that work". Trial Transcript at 45. According to Porter, appellant did not do any of the construction work. In short, there was sufficient competent and credible testimony presented at trial supporting the trial court's determination that appellee had provided almost all of the labor in the construction of the house.
Based on the trial court's above determination, coupled with appellee's obligation on the mortgage and note and potential liability in the event of a default on the same, we find that the trial court's judgment in favor of appellee on his unjust enrichment claim was not against the manifest weight of the evidence. We concur with the trial court that the retention of benefits by appellant would be unjust and unconscionable. This is not a case in which the trial court was dividing property based on "mere cohabitation without marriage." See Seward, supra.
While appellant, in support of her argument, relies on the Seward
case, we agree with the trial court that such case is distinguishable since appellant, in the case sub judice, not only provided almost all of the labor, but also is jointly liable upon the note and mortgage for appellant's residence. In contrast, in the Seward case, the trial court, in holding that the appellant, a lesbian, was not entitled to be reimbursed for improvements to her former partner's residence based on a theory of unjust enrichment, noted that the appellant had enjoyed the benefits of the improvements that the parties jointly made to the residence. Moreover, there was no evidence, in Seward, as in the case subjudice, that the appellant was jointly liable on a mortgage and note.[3]
As is stated above, appellant further challenges the trial court's judgment, arguing that the same is contrary to law since the record contains no evidence of the value of services for which appellee sought compensation. The trial court, in its August 3, 2001, Journal Entry, awarded appellee $14,295.28, which is one half of the equity in the house. Appellant's own appraiser had opined that the house had a fair market value of between $54,000 and $56,000.
While appellant is correct that appellee presented no evidence as to the actual amount of hours that he expended in constructing the house and/or the value of the same, as is discussed above, there was ample evidence presented at trial that appellee did "almost" all of the construction work on the house. We find, therefore, that the trial court was justified in awarding appellee one half of the equity in the same.
Appellant's two assignments of error are, therefore, overruled.
Accordingly, the judgment of the Holmes County Court of Common Pleas is affirmed.
By EDWARDS, J. HOFFMAN, P.J. and WISE, J. concur
 JUDGMENT ENTRY
For the reasons stated in the Memorandum-Opinion on file, the judgment of the Holmes County Court of Common Pleas is affirmed. Costs to appellant.
[1] During the trial, the trial court granted appellant's motion for a directed verdict as to appellee's claim that the parties had a common law marriage.
[2] The roof trusses had to be replaced due to a storm.
[3] Appellant also cites Tarry v. Stewart (1994), 98 Ohio App.3d 533 in support of her argument that the trial court erred in awarding appellee damages for unjust enrichment. However, we note that in Tarry, the court found that the evidence presented was insufficient to establish that the appellant's work on two residences that she shared with appellee resulted in the unjust enrichment of the appellee. Such is not the case in this matter. Furthermore, there is no evidence in Tarry that the appellant was liable on the mortgage and note for the residences.